UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LARRY JOHN LIZOTTE,

                     Plaintiff,           Case No. 12-cv-10181
                                          Honorable Sean F. Cox
                                          Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                     Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [8, 9]**

Plaintiff Larry John Lizotte ("Lizotte") brings this action pursuant to 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [8, 9], which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

## I.     RECOMMENDATION

For the reasons set forth below, the court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") assessment that Lizotte is not disabled under the Act. Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [9] be GRANTED, Lizotte's Motion for Summary Judgment [8] be DENIED, and that, pursuant to sentence four of 42 U.S.C. §405(g), the Commissioner's decision be AFFIRMED.

## II.     REPORT

### A.     Procedural History

On September 22, 2008, Lizotte filed an application for DIB, alleging disability

beginning on July 25, 2005.[1]  (Tr. 108-14).  The claim was denied initially on January 15, 2009.  (Tr. 54-57).  Thereafter, Lizotte filed a timely request for an administrative hearing, which was held on July 1, 2010, before ALJ Regina Sobrino.  (Tr. 29-45).  Lizotte (represented by attorney Jeffrey Atkin) testified at the hearing, as did vocational expert ("VE") Judith Findora.  (*Id.*).  On December 7, 2010, the ALJ found that Lizotte was not disabled.  (Tr. 19-25).  On November 16, 2011, the Appeals Council denied review.  (Tr. 1-3).  Lizotte filed for judicial review of the final decision on January 16, 2012 [1].

### B.     Background

#### 1.     Disability Reports

In an undated disability report, Lizotte indicated that his ability to work was limited by "left shoulder surgery, herniated disc (neck) w/surgery."  (Tr. 174).  When asked how these conditions limited his ability to work, Lizotte stated:  "I retired because of my disability.  I have debilitating pain if I use my arms too much or extend them beyond a certain range of motion (over my head)."  (*Id.*).  Lizotte reported that these conditions first interfered with his ability to work on July 25, 2005, and that he became unable to work on that date.  (*Id.*).

Lizotte completed high school but has no specialized job training.  (Tr. 179-80).  Prior to stopping work, Lizotte worked on an automotive assembly line, earning $27.68 per hour.  (Tr. 174-75).  He was required to walk and stand four hours per day; handle, grab, or grasp big objects seven hours per day; and reach six hours per day.  (Tr. 175).  He was frequently required to lift less than ten pounds, and the heaviest weight he lifted was fifty pounds.  (*Id.*).

Lizotte reported being seen by several doctors regarding his shoulder and neck conditions.  (Tr. 176-78).  He was taking Nexium (for acid reflux) and Vytorin (for high

---

[1] Lizotte amended his application to reflect this date of alleged onset of disability.  (Tr. 115).

cholesterol).  (Tr. 179).  These medications did not cause any side effects.  (*Id.*).  He also reported taking a daily low-dose aspirin and a multi-vitamin (neither by prescription).  (Tr. 180). He had a blood test (in June 2008), as well as MRIs of his neck and left shoulder (in 2005).  (Tr. 179).

In a function report dated October 29, 2008, Lizotte reported that he lived in a house with his spouse.  (Tr. 196).  He indicated that, on a typical day, he was able to watch television, get the mail, use the computer, go to the store, run errands, help with housework (including vacuuming and laundry), go for a boat ride or a walk, make dinner, and do the dishes.[2]  (*Id.*).  He was able to take care of animals, although his spouse helped with this.  (Tr. 197).  He no longer mowed the lawn, shoveled snow, gardened, or carried things.  (*Id.*).  He had some trouble with personal care, including lacing his belt, washing his back, and caring for his hair.  (*Id.*).  He was able to prepare his own meals, and did so at least once a day.  (Tr. 198).  He took out the garbage and helped with laundry and housecleaning.  (*Id.*).  He went outside daily and was able to walk and drive.  (Tr. 199).  He spent two or three hours per week shopping, whether at the grocery store, the drugstore, for clothing, or for gas.  (*Id.*).  He was still able to engage in his hobbies (reading, watching television, recording music, and using the computer), although not as often as he would have liked.  (Tr. 200).  Once or twice a week, he spent time with others, going out to dinner, going to sporting events, or socializing with friends in their homes.  (*Id.*).

When asked to identify functions impacted by his condition, Lizotte checked lifting, bending, reaching, and using his hands.  (Tr. 201).  He further explained that his arms needed to stay close to his body for him to lift anything without pain, and that he could not reach above

---

[2] In a June 2006 function report, Lizotte reported similar daily activities, including dressing himself, watching television, doing chores, and going to appointments.  (Tr. 161).  He also reported taking care of his cats, folding laundry, mowing the lawn, driving, and grocery shopping.  (Tr. 162-64).

shoulder height without pain. (*Id.*). He could walk one mile before needing to stop and rest for ten minutes. (*Id.*). He had no problem paying attention, following instructions, or getting along with authority figures. (Tr. 201-02).

In an undated disability appeals report, Lizotte reported there had been no change in his condition since the date of his last disability report (January 15, 2009). (Tr. 207). Since that time, Lizotte had not received any treatment for his conditions, had undergone no medical tests, and was taking no new medications. (Tr. 208-09). He indicated that his conditions did not affect his ability to care for his personal needs, and that there were no changes in his daily activities. (Tr. 209).

### 2. *Plaintiff's Testimony*

At the July 1, 2010 hearing before the ALJ, Lizotte testified that he graduated from high school. (Tr. 33). He worked full-time as an assembly line worker until July 25, 2005. (Tr. 41). Since that time, he had not worked at all because of his neck and shoulder pain, but was receiving worker's compensation payments. (Tr. 33, 38).

Lizotte testified that he is most comfortable lying down; he cannot stand or walk for more than 30 minutes at a time, and cannot sit for more than 45 minutes at a time. (Tr. 33, 39). He has trouble reaching over his head with both hands. (Tr. 34). He cannot lift more than 15-20 pounds because of the pain in his shoulder and neck.[3] (*Id.*). He also has trouble using his left hand because he has "some numbness" in two fingers; at the time of the hearing, however, Lizotte had not seen a doctor regarding this condition. (*Id.*). He also has trouble bending at the knees and crouching down. (*Id.*).

---

[3] Upon follow-up questioning by his own attorney, Lizotte indicated that he has to use two hands to lift 15-20 pounds and that, on occasion, he has trouble lifting even a gallon of milk with one hand. (Tr. 38).

Lizotte testified that he is able to do chores (including cooking, cleaning, and laundry), shop for groceries, and visit friends and relatives.  (Tr. 35).  He is unable to vacuum because the "back and forth" motion bothers his neck and shoulder.  (Tr. 39).  He drives to the store and to music festivals, and he rode as a passenger in a car to Florida after he stopped working.  (Tr. 35-36).  He is able to mow his lawn with a push mower.  (Tr. 35).

Lizotte testified that he has a family physician (Dr. Vincent Guglielmetti), but he had not seen him (or any other doctor) in two years.  (Tr. 36).  The only medication he was taking at the time of the hearing was Advil.  (Tr. 36).

> 3.    *Medical Evidence*

> (a)    *Treating Sources*

On June 23, 2005, Lizotte saw Dr. Thomas Perkins at Michigan Knee and Shoulder Institute for evaluation of left shoulder pain.  (Tr. 267).  He reported that he was injured at work on April 27, 2005, that he had developed pain and pulling in the scapula, which radiated into his neck, and that he had been working with restrictions.  (*Id.*).  Lizotte was diagnosed with shoulder impingement syndrome and bursitis, and physical therapy and anti-inflammatories were prescribed.  (Tr. 269).  He was told to avoid repetitive overhead/outstretched motions and heavy lifting.  (*Id.*).

On August 25, 2005, Lizotte saw Dr. Perkins for a re-check of his left shoulder and an injection.  (Tr. 263, 265).  At that point, Lizotte had finished one month of physical therapy, but he reported continued pain, "popping," and loss of motion in the shoulder, as well as pain in the scapula.  (Tr. 263).  Dr. Perkins suggested that if his shoulder did not improve with further physical therapy and anti-inflammatories, he obtain an MRI of the shoulder to rule out rotator cuff pathology.  (Tr. 265).  He was permitted to return to work with certain restrictions, including

limited pushing and pulling with his left arm (less than 5 pounds), no lifting over 10 pounds, and no work at or above shoulder level. (Tr. 336). His employer was unable to accommodate these restrictions, however, so Lizotte remained off work. (*Id.*).

On September 10, 2005, Lizotte underwent an MRI of his left shoulder, which showed tendinosis and "mild impingement of the acromion on the supraspinatus tendon." (Tr. 228). On October 13, 2005, Lizotte again saw Dr. Perkins, who, based on the September 2005 MRI results, diagnosed Lizotte with shoulder impingement syndrome, bursitis, and a chronic partial tear of the rotator cuff. (Tr. 258). The option of surgery to repair the tear was discussed. (*Id.*).

On October 27, 2005, Lizotte saw Andrew Limbert, D.O. at Oakland Bone & Joint Surgery for an initial evaluation regarding his left shoulder pain. (Tr. 238-39). Dr. Limbert noted that Lizotte had a significant loss of range of motion of the cervicodorsal spine, a markedly positive Spurling's maneuver, decreased grip strength on the left side, and a dermatomal pattern of C6 to 7 nerve root irritation in the upper left extremity. (Tr. 238). He diagnosed Lizotte with mild impingement syndrome in the left shoulder and degenerative disc disease in the sternoclavicular spine, and recommended x-rays, an MRI, and physical therapy. (*Id.*). Dr. Limbert indicated that he concurred in "continuing work disabilities secondary to his current work restrictions." (Tr. 239).

On November 3, 2005, Lizotte underwent an MRI of his cervical spine. (Tr. 240). The MRI found a moderate sized left paramedian/foraminal disc protrusion at C5-6, but no stenosis. (*Id.*). X-rays performed that same day indicated "no definite acute abnormality." (Tr. 242). On November 10, 2005, Dr. Limbert recommended that Lizotte follow up with his primary care physician for a "trial of conservative management," including physical therapy, and indicated that Lizotte should not return to work for at least one month. (Tr. 237). Lizotte did attend

physical therapy during that time, and progress notes indicate that he was progressing in improving his cervical spine range of motion and left upper extremity strength. (Tr. 246). He reported obtaining 3-4 hours of relief after each physical therapy session. (*Id.*).

On December 6, 2005, Lizotte saw Dr. Bill Underwood at Neuro Surgical Consultants, P.C., regarding his neck and left arm pain. (Tr. 243-45). After examining Lizotte and reviewing the results of his November 2005 MRI, Dr. Underwood indicated that Lizotte "would benefit from conservative therapy." (Tr. 245). He gave Lizotte a prescription to see another physician for evaluation and treatment (including cervical epidural injections), and indicated that he should resume physical therapy. (*Id.*).

On February 7, 2006, Lizotte saw Dr. Perkins for a re-check of his left shoulder, which was still painful and worse with certain motions, and to discuss surgical options. (Tr. 252). He reported that multiple attempts at conservative treatment (including physical therapy and injections) had failed. (*Id.*). Dr. Perkins recommended arthroscopic surgery to evaluate the shoulder and, if necessary, to repair the rotator cuff. (Tr. 254). On March 6, 2006, arthroscopic surgery was performed – specifically a subacromial decompression and labrum debridement. (Tr. 275). Surgery revealed that there was, in fact, no rotator cuff tear. (Tr. 275-76).

On March 14, 2006, Lizotte saw Dr. Perkins for a postoperative visit. (Tr. 302). At that time, he was in minimal pain. (*Id.*). On May 18, 2006, Lizotte followed up with Dr. Perkins for his second postoperative visit on his left shoulder. (Tr. 298). He reported that he only attended four weeks of physical therapy because he went to Florida. (*Id.*). His range of motion was not back to normal, and he indicated a desire to go back to physical therapy to regain more motion and strength. (*Id.*). He was given a note to return to work with the restriction that he not engage in repetitive overhead movements. (Tr. 300, 354). That same month, an electrodiagnostic

report/nerve conduction study revealed normal results in the upper extremities. (Tr. 337).

Lizotte also saw Dr. Richard Easton, an orthopedic surgeon, on several occasions in 2006 regarding his neck pain. Dr. Easton diagnosed Lizotte with a herniated disc at C5-6 and performed an anterior cervical discectomy and fusion surgery on October 17, 2006. (Tr. 434-35). On November 13, 2006, Lizotte saw Dr. Easton in follow-up and reported that his symptoms were "much better." (Tr. 436). Because he was still having some muscle pain, he elected to undergo additional physical therapy. (*Id.*). On December 18, 2006, Lizotte returned to see Dr. Easton, reporting that he was feeling better but still had some pain in his shoulder. (*Id.*). He expressed an intent to return to work in February of 2007. (*Id.*).

Between December of 2006 and the time of the hearing (on July 1, 2010), it does not appear that Lizotte treated with any physicians. Indeed, at the hearing, Lizotte testified that he had not seen a doctor in approximately two years. (Tr. 36). After the hearing, however, on September 16, 2010, Lizotte saw Dr. Paul LaClair at St. Mary's of Michigan Spine Care for further treatment of his left neck and shoulder pain. (Tr. 443-44). Lizotte recounted his surgical history, saying that he "did reasonably well for a couple of years" following his October 2006 cervical spine surgery. (Tr. 443). However, he was experiencing increasing symptoms in the left neck and shoulder, with intermittent numbness and tingling in the left hand. (*Id.*). On examination, Dr. LaClair noted that cervical rotation was restricted to the left with a mildly positive Spurling's maneuver to the left. (Tr. 444). Dr. LaClair indicated that Lizotte appeared to have mild left C5-6 radiculopathy and ordered an updated cervical spine MRI. (*Id.*). There are no further medical records in evidence.

*(b)    Consultative Examinations*

On July 10, 2006 a physical residual functional capacity ("RFC") assessment was

conducted.  (Tr. 391-98).  DeShawn McGhee, a state agency medical consultant, examined Lizotte's medical records and concluded that he retained the ability to occasionally/frequently lift 10 pounds, stand and/or walk for 6 hours in an 8-hour work day, sit for 6 hours in an 8-hour workday, and that he should only occasionally push or pull using his left shoulder.  (Tr. 392).  McGhee further concluded that Lizotte could occasionally crawl and climb ramps, stairs, ladders, ropes, and scaffolds, and that he was not limited in stooping, balancing, or kneeling.  (Tr. 393).  In addition, McGhee concluded that Lizotte should avoid overhead reaching with his left arm, should be limited in handling, and should be limited in exposure to vibration.  (Tr. 394-95).

On January 12, 2009, a consultative physical examination was performed by Dr. Neil Friedman, a physiatrist.  (Tr. 407-09).  On physical examination, active cervical range of motion was full in all planes.  (Tr. 408).  Deep tendon reflexes were symmetric in the arms.  (*Id.*).  Manual testing of the major muscle groups in the upper extremities revealed no evidence of focal or diffuse weakness.  (*Id.*).  Lizotte walked with a normal gait and had no difficulty rising from a standard chair or getting on/off the examining table.  (*Id.*).  Based upon examination, Dr. Friedman opined that Lizotte would be able to work eight hours per day with restrictions of "no repetitive or prolonged cervical flexion/extension or cervical rotation" and no use of the left arm above shoulder level.  (Tr. 409).  Dr. Friedman further opined that Lizotte should not push, pull, lift or carry more than 20 pounds occasionally or more than 10 pounds frequently with the left upper extremity.  (*Id.*).

On January 14, 2009, another physical RFC assessment was conducted.  (Tr. 412-19).  That time, "R. Bell," a state agency medical consultant, examined Lizotte's medical records and concluded that he retained the ability to occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk for 6 hours in an 8-hour work day, sit for 6 hours in an 8-hour workday, and

that he was not limited in the ability to push or pull.  (Tr. 413).  Bell further concluded that

Lizotte could never climb ladders, ropes, or scaffolds, and should avoid overhead reaching with

his left arm.  (Tr. 414-15).

4.    *Vocational Expert's Testimony*

Judith Findora testified as an independent vocational expert ("VE").  (Tr. 40-44).  The

ALJ asked the VE to imagine a claimant of Lizotte's age, education, and work experience, who

would be limited as follows:

> Assume a person who cannot lift or carry more than 10 pounds
> frequently, no more than 20 pounds occasionally, and the person
> should be able to use both hands to do that.  There should be no
> pushing or pulling required.  Assume a person who can stand and
> walk about six hours in an eight-hour workday; sit up to eight
> hours in an eight-hour workday; but the person should be able to
> alternate position for up to five minutes, approximately every 30
> minutes.  The person should not climb ladders; should not need to
> crawl; can only occasionally climb stairs, stoop, and crouch.
> Assume a person limited to frequent handling, fingering, and
> feeling with the left hand, and that's the nondominant hand.  The
> person should not need to reach above shoulder level, should not
> need to reach behind the back.  There should be no exposure to
> hazardous [sic] or vibration.  The work should not involve more
> than occasional flexion, extension, and rotation of the neck.

(Tr. 41).  The VE testified that the hypothetical individual could not perform Lizotte's past

relevant work.  (Tr. 41-42).  The VE further testified, however, that the hypothetical individual

would be capable of working in various light jobs that were available in Michigan, including:

cashier (10,000 jobs); counter clerk (3,000 jobs); general office clerk (7,000 jobs); additional

administrative support worker (2,000 jobs); and information clerk (2,500 jobs).  (Tr. 42).  She

further testified that the hypothetical individual would be capable of working in sedentary jobs

that were available in Michigan, including: cashier (1,200 jobs); general office clerk (3,000

jobs); additional administrative support worker (2,000 jobs); information clerk (2,400 jobs); and

assembler (1,700 jobs).  (*Id.*).  Upon questioning by Lizotte's attorney, the VE also testified that

10

if the hypothetical individual was required to take breaks every 15-30 minutes, or to alternate

between sitting, standing, and lying down, there would be no jobs in the national economy that

he could perform.  (Tr. 43-44).

### C.    Framework for Disability Determinations

Under the Act, DIB are available only for those who have a "disability."  *See Colvin v.*

*Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result in
> death or which has lasted or can be expected to last for a continuous period of not
> less than 12 months.

42 U.S.C. §1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to be

determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity,
> benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of
> impairments that "significantly limits . . . physical or mental ability to do basic
> work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a
> severe impairment that is expected to last for at least twelve months, and the
> severe impairment meets or equals one of the impairments listed in the
> regulations, the claimant is conclusively presumed to be disabled regardless of
> age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work,
> benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work,
> if other work exists in the national economy that the claimant can perform, in
> view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331 (E.D. Mich. Dec. 6, 2011), *citing* 20

C.F.R. §§404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir.

2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the

11

analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.    The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that Lizotte is not disabled under the Act.  At Step One, the ALJ found that Lizotte has not engaged in substantial gainful activity since July 25, 2005, his alleged onset date.  (Tr. 21).  At Step Two, the ALJ found that Lizotte has the severe impairments of degenerative disc disease and degenerative joint disease. (*Id.*).  At Step Three, the ALJ found that neither of Lizotte's severe impairments meet or medically equal a listed impairment.  (*Id.*).

The ALJ then assessed Lizotte's residual functional capacity ("RFC"), considering the degree of limitation found in the physical function analysis, and concluded that Lizotte is capable of performing light work, as defined in 20 C.F.R. §416.1567(b), with the following additional limitations:  lifting and carrying up to 10 pounds frequently and up to 20 pounds occasionally, using both hands; no pushing or pulling; no more than occasional flexion, extension, or rotation of the neck; standing/walking 6 hours per 8-hour workday, with the opportunity to alternate position for up to 5 minutes approximately every 30 minutes; occasional climbing of stairs, balancing, stooping, and crouching; no crawling; no climbing of ladders; no exposure to hazards or vibration; frequent handling, fingering, and feeling with the left (non-dominant) hand; no reaching above shoulder level; and no reaching behind the back.  (*Id.*).  At Step Four, the ALJ determined that Lizotte cannot do his past relevant work as an assembler or hi-lo driver.  (Tr. 24).  At Step Five, the ALJ concluded, based in part on the VE's testimony, that Lizotte is capable of performing a significant number of jobs that exist in the national economy.  (Tr. 24-

25).  As a result, the ALJ concluded that Lizotte is not disabled under the Act.  (Tr. 25).

     **E.**    **Standard of Review**

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the

Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.      Analysis

Lizotte argues that, in concluding he was capable of performing a significant number of jobs that exist in the national economy, the ALJ failed to adequately assess the credibility of his subjective complaints and properly evaluate all of the medical evidence submitted. As a result, Lizotte argues, the ALJ failed to pose a hypothetical question to the VE that adequately took into account all of his limitations. A review of the record and the ALJ's decision, however, makes clear that the ALJ committed no error warranting remand.

### i.      The ALJ Did Not Err in Her Evaluation of Lizotte's Credibility or the Record Medical Evidence

As the Sixth Circuit has held, determinations of credibility related to subjective complaints of pain rest with the ALJ because "the ALJ's opportunity to observe the demeanor of the claimant 'is invaluable, and should not be discarded lightly.'" *Kirk v. Secretary of Health & Human Servs.,* 667 F.2d 524, 538 (6th Cir. 1981) (quoting *Beavers v. Secretary of Health, Ed. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)). Thus, an ALJ's credibility determination will not be

disturbed "absent compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). The ALJ is not simply required to accept the testimony of a claimant if it conflicts with medical reports and other evidence in the record. *See Walters v. Commissioner of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997). Rather, when a complaint of pain is in issue, after the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, she must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record" to determine if the claimant's claims regarding the level of her pain are credible. *Soc. Sec. Rul.* 96-7, 1996 WL 374186, *1 (July 2, 1996); *see also* 20 C.F.R. § 404.1529.

In this case, after finding at Step Two that Lizotte has the severe impairments of degenerative disc disease and degenerative joint disease (Tr. 21), the ALJ concluded that Lizotte has the residual functional capacity to perform a significant number of light and sedentary jobs that exist in the national economy. (Tr. 24-25). In reaching this conclusion, the ALJ properly considered both Lizotte's subjective complaints and the objective medical evidence.

The ALJ specifically referenced Lizotte's testimony that he suffers from neck and shoulder pain, has difficulty reaching overhead, and has numbness in the fourth and fifth fingers on his left hand (which affects his ability to grasp). (Tr. 22). However, the ALJ found that while Lizotte's conditions could reasonably be expected to produce the alleged symptoms, his statements about the intensity, persistence and limiting effects of those symptoms were not entirely credible to the extent they conflicted with the RFC assessment. (Tr. 18). Specifically, the ALJ noted that Lizotte attends to his own grooming and hygiene, performs some household and lawn care chores, attends concerts, drives, maintains social contact with friends, watches

15

television and listens to music.  (Tr. 23).  The ALJ further noted that, at the time of the hearing,

Lizotte had not seen a physician (or had any medical treatment) in approximately two years, and

the only medication he was taking was non-prescription Advil.  (*Id.*).  Other record evidence

regarding Lizotte's personal activities is also consistent with the ALJ's findings, including that

he goes for walks, drives, goes shopping, etc.  *See supra* at 3, 5.  (Tr. 35-36, 198-200).

In addition to evaluating Lizotte's subjective complaints, the ALJ also considered, in

detail, the medical records in evidence, concluding that there was insufficient evidence to

support the limitations alleged by Lizotte during the period at issue.  (Tr. 22-24).  As the ALJ

noted, an October 2005 MRI of Lizotte's left shoulder showed "mild impingement of the

acromion on the supraspinatus tendon," along with a partial rotator cuff tear.  (Tr. 228, 258).

Lizotte had arthroscopic surgery on his left shoulder on March 6, 2006.  (Tr. 275-76).  The ALJ

noted that following that surgery, Lizotte reported only "minimal pain" and "no numbness or

tingling down his arm."  (Tr. 22, 298, 302).  A May 2006 electrodiagnostic report/nerve

conduction study revealed normal results in the upper extremities.  (Tr. 22, 337).  That same

month, Dr. Perkins opined that Lizotte could return to "light duty" work, which was interpreted

as "no repetitive overhead movements."  (Tr. 22, 300, 354).

Similarly, in November 2005, Lizotte had an MRI of his cervical spine, which showed a

moderate sized left paramedian/foraminal disc protrusion at C5-6, but no stenosis.  (Tr. 240).

Eventually, Lizotte was diagnosed with a herniated disc at C5-6, and he underwent an anterior

cervical discectomy and fusion surgery on October 17, 2006.  (Tr. 434-35).  Following that

surgery, Lizotte reported that his symptoms were "much better" and that his numbness and

tingling were gone.  (Tr. 23, 436).  In December 2006, Lizotte reported that although he was still

having some pain in his shoulder, he was planning to return to work in February 2007.  (*Id.*).

16

The ALJ also noted Lizotte's July 1, 2010 hearing testimony that "he had not had treatment or seen a physician for two years" and that his "only medication [at that time] was non-prescription Advil." (*Id.*). *See Blacha v. Secretary of Health and Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) (claimant's "use of only mild medications (aspirin) undercuts complaints of disabling pain…as does his failure to seek treatment…") (internal citations omitted).

The ALJ also explicitly considered Dr. Friedman's consultative physical examination, which was conducted on January 12, 2009. (Tr. 23). On physical examination, Lizotte's active cervical range of motion was full in all planes. (Tr. 23, 408). Deep tendon reflexes were symmetric in the arms, and manual testing of the major muscle groups in the upper extremities revealed no evidence of focal or diffuse weakness. (*Id.*). Lizotte walked with a normal gait and had no difficulty arising from a standard chair or getting on/off the examining table. (*Id.*). Based upon examination, Dr. Friedman opined that Lizotte would be able to work eight hours per day with restrictions of "no repetitive or prolonged cervical flexion/extension or cervical rotation" and no use of the left arm above shoulder level. (Tr. 409). Dr. Friedman further opined that Lizotte should not push, pull, lift or carry more than 20 pounds occasionally or more than 10 pounds frequently with the left upper extremity. (*Id.*).

In sum, the ALJ recognized the duty imposed upon her by the regulations and, in addition to Lizotte's own subjective complaints, she considered the objective medical evidence and Lizotte's daily activities during the relevant time period. The ALJ's credibility determination is supported by substantial evidence in the record, and her conclusion that Lizotte had the RFC to perform certain light and sedentary work should not be disturbed.

Lizotte's arguments to the contrary are without merit. First, Lizotte argues that the ALJ did not properly assess his credibility and, thus, erred in failing to pose a hypothetical question to

17

the VE which included all of his physical limitations.  Specifically, Lizotte asserts that the ALJ improperly discredited his testimony that he needs to take periodic breaks (every 15-30 minutes) and that he needs to alternate between sitting, standing, and lying down during the course of an eight-hour workday.  (Doc. #8 at 7-11).

As set forth above, however, the ALJ did consider Lizotte's testimony, as well as the objective medical evidence, in determining Lizotte's RFC.  Nowhere in the medical evidence does any doctor impose restrictions on Lizotte requiring him to take breaks every 15-30 minutes, or to alternate between sitting, standing, and lying down throughout the day.  None of Lizotte's treating physicians indicated that such restrictions were necessary, and neither did the consultative examiner.  Simply put, the ALJ's decision not to include these alleged limitations in her hypothetical to the VE is supported by substantial evidence.

### ii.   The ALJ Did Not Err in Allegedly Failing to Consider Dr. LaClair's September 2010 Treatment Records, and No Remand to Consider Them is Warranted

Lizotte appears to argue that the ALJ erred in failing to consider medical records (Tr. 443-444) regarding his treatment with Dr. Paul LaClair on September 16, 2010.  (Doc. #8 at 10). From a review of the record, however, it appears that the documents pertaining to Lizotte's visit to Dr. LaClair were not submitted to the ALJ before she issued her decision on December 7, 2010.  Rather, it appears that Lizotte submitted Dr. LaClair's records to the Appeals Council in support of his appeal of the ALJ's decision.  (Tr. 4-5).  Because these medical records apparently were not submitted to the ALJ, she did not err in failing to consider them.[4]

Essentially, then, Lizotte is asking this court to remand the case to the ALJ, pursuant to

---

[4] Even if Dr. LaClair's records were before the ALJ and she failed to discuss them, it would not change the court's above analysis or conclusion that the ALJ's decision is supported by substantial evidence.  *See infra* at 20.

18

sentence six of 42 U.S.C. §405(g), for consideration of these medical records.  The court declines to do so.

Remand to consider additional evidence is appropriate only when the evidence is new and material, and good cause is shown as to why it was not presented at the prior proceeding. *See* 42 U.S.C. §405(g); *Willis v. Secretary of Health & Human Servs.*, 727 F.2d 551, 554 (6th Cir. 1984).  Evidence is "new" if it was "not in existence or available to the claimant at the time of the administrative proceeding."  *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001).  Evidence is "material" if there is "a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence."  *Sizemore v. Secretary of Health & Human Servs.*, 865 F.2d 709, 712 (6th Cir. 1988).  "Good cause" requires the claimant to demonstrate "a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ."  *Foster*, 279 F.3d at 357.

Here, the medical records reflecting Lizotte's visit to Dr. LaClair on September 16, 2010 can be considered "new" evidence, as that visit did not exist until after the hearing on July 1, 2010.  (Tr. 443-44).  However, Lizotte has not established "good cause" for his failure to submit these records sooner.  As this court recently recognized, "'Good cause' is *not* established solely because the new evidence was not generated until after the ALJ's decision; the Sixth Circuit has taken a 'harder line' on the good cause test."  *Richardson v. Commissioner of Soc. Sec.*, 2012 WL 4210619, *4 (E.D. Mich. Aug. 27, 2012) (citing *Oliver v. Secretary of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986)) (emphasis in original).  A plaintiff attempting to introduce new evidence "must explain why the evidence was not obtained earlier and submitted to the ALJ before the ALJ's decision."  *Richardson*, 2012 WL 4210619, at *4.  Here, Lizotte has offered no explanation as to why he failed to submit Dr. LaClair's records to the ALJ between

19

the time of his visit (in September 2010) and the issuance of her decision (nearly three months later).

Lizotte also has failed to demonstrate that Dr. LaClair's records are material.  At his only visit to Dr. LaClair, regarding his left neck and shoulder pain, Lizotte indicated that he "did reasonably well for a couple of years" following his October 2006 cervical spine surgery, but was beginning to experience increasing symptoms in the left neck and shoulder, along with intermittent numbness and tingling in the left hand.  (Tr. 443).  Dr. LaClair noted that cervical rotation was restricted to the left with a mildly positive Spurling's maneuver to the left.  (Tr. 444).  He indicated that Lizotte appeared to have mild left C5-6 radiculopathy and ordered an updated cervical spine MRI.  (*Id.*).  The record contains no evidence that Lizotte ever obtained that MRI, however, nor is there any evidence of subsequent medical treatment.  Given this limited information, and particularly in light of Lizotte's own representation that he had done "reasonably well for a couple of years," Dr. LaClair's records do not alter any of the court's above conclusions, *supra* fn. 4, and Lizotte has not shown "a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence."  *Sizemore*, 865 F.2d at 712.  Accordingly, Dr. LaClair's records are not material and a sentence six remand is not warranted.  (*Id.*).

## III.    CONCLUSION

For the foregoing reasons, the court RECOMMENDS that Lizotte's Motion for Summary Judgment [8] be DENIED, the Commissioner's Motion for Summary Judgment [9] be GRANTED, and this case be AFFIRMED.

Dated: September 25, 2012                      s/David R. Grand
Ann Arbor, Michigan                           DAVID R. GRAND
                                              United States Magistrate Judge

20

## NOTICE

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 25, 2012.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager